# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1630

_____

| | | |
|---|---|---|
| United Transportation Union, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | |
| | * | |
| Honorable Rodney Slater, Secretary | * | |
| of Transportation; United States | * | |
| Department of Transportation; | * | Petition for Review of an Order |
| Honorable Jolene Molitoris, Federal | * | of the Federal Railroad Administration |
| Railroad Administor; Federal | * | |
| Railroad Administration, | * | |
| | * | |
| Respondents. | * | |
| | * | |
| Norfolk and Western Railway Co., | * | |
| | * | |
| Intervenor on Appeal. | * | |

_____

Submitted:  November 19, 1997

Filed:  July 16, 1998

_____

Before McMILLIAN and WOLLMAN, Circuit Judges, and STEVENS,[1] District
    Judge.

---

[1]The Honorable Joseph E. Stevens, Jr., United States District Judge
for the Western District of Missouri, sitting by designation.

McMILLIAN, Circuit Judge.

United Transportation Union (the union) petitions for review of a final order of the Federal Railroad Administration (the FRA), an agency within the Department of Transportation, holding that plans being carried out by Norfolk Southern Corporation (Norfolk) to renovate sleeping quarters at a switching yard in Moberly, Missouri, do not violate the Hours of Service Act (HSA), as amended in 1976, 49 U.S.C. § 21106. Norfolk and Western Railway Company[2] intervenes in support of the FRA's decision. The union filed its petition for review pursuant to 28 U.S.C. § 2344, and we have jurisdiction to review the FRA's decision pursuant to 28 U.S.C. § 2342. The union asks us to (1) order the FRA to stop the renovations of Norfolk's sleeping quarters at the Moberly site on the ground that they violate 49 U.S.C. § 21106(2) and (2) order the FRA to rule that the facility is not clean, safe, sanitary, and adequately free from noise, in violation of § 21106(1). Brief for Petitioner at 18-19. For the reasons stated below, we deny the relief requested in the petition for review.

## Background

The sleeping and eating facilities for railroad workers at the Moberly, Missouri, switching yard were originally constructed over thirty years ago. It is undisputed in the present case that these living quarters are in the immediate vicinity of an area in which railroad switching operations are performed. It is also essentially undisputed that, in recent years, health and safety conditions at the Moberly site had reached intolerable

---

[2]According to the affidavit of Eileen Meyers, a transportation analyst employed by Norfolk, Norfolk and Western Railway Company is a wholly-owned subsidiary of Norfolk. Addendum to Brief for Intervenor (Norfolk and Western Railway Company) at 1.

levels, workers and the union complained regularly, and violations were reported by inspectors for the county and the FRA.

In or about the spring of 1996, Norfolk developed plans to renovate the sleeping and eating facilities at the Moberly site to address these problems. Upon learning of Norfolk's plans, the union complained to Norfolk that renovating the existing facilities would violate the HSA[3] because they were located too close to the switching operations. In response, Norfolk assured the union that the proposed renovations would address all past health and safety problems, including the noise problem. The union still opposed the plans, however, citing other safety concerns resulting from the

---

[3]The Hours of Service Act provides in relevant part:

A railroad carrier and its officers and agents –

(1) may provide sleeping quarters (including crew quarters, camp or bunk cars, and trailers) for employees, and any individuals employed to maintain the right of way of a railroad carrier, only if the sleeping quarters are clean, safe, and sanitary and give those employees and individuals an opportunity for rest free from the interruptions caused by noise under the control of the carrier; and

(2) may not begin, after July 7, 1976, construction or reconstruction of sleeping quarters referred to in clause (1) of this section in an area or in the immediate vicinity of an area, as determined under regulations prescribed by the Secretary of Transportation, in which railroad switching or humping operations are performed.

49 U.S.C. § 21106.

facilities' proximity to the rail lines.[4]  Norfolk proceeded with the renovations as planned.

The union next complained to the FRA in September 1996.  The union's complaint to the FRA was lodged by way of a telephone call and a letter confirming that telephone call.  See Addendum to Brief for Petitioner at 4 (letter dated Sept. 24, 1996, from the union to the FRA).  The union's claims before the FRA were that (1) the proposed renovations violated 49 U.S.C. § 21106(2) because they would constitute "reconstruction" of the sleeping quarters in an area or in the immediate vicinity of an area where railroad switching or humping operations are performed and (2) the sleeping quarters would violate § 21106(1) because they would not be safe, clean, sanitary, and would not give residents an opportunity for rest free from interruptions caused by noise under Norfolk's control.

In a letter dated February 27, 1997, the FRA informed the union that it had conducted an investigation and had decided not to take any action against Norfolk at that time.  Id. at  1-3 (letter dated Feb. 27, 1997, from the FRA to the union).   The FRA explained that, although its inspector had discovered sewage  problems with the

_____

[4]The impetus for Congress's enactment of § 21106(2), barring "construction or reconstruction" of sleeping quarters in or near switching or humping operations, was an accident in 1974, in Decatur, Illinois, in which seven railroad employees were killed and over 100 were injured when an explosion occurred while hazardous substances were being switched in the yard near sleeping and eating quarters.  See Brief for Petitioner at 4-5 (citing legislative history); Brief for Respondent at 6-7 & n.6.  Therefore, § 21106(2) resulted in part from Congress's desire to minimize the dangers to workers resulting from potential accidents or explosions in switching yards, not merely its desire to address the noise issue.  See United Transp. Union v. Dole, 797 F.2d 823, 832 (10th Cir. 1986) (Logan, J., concurring) ("I read Congress' broader intention to mean that a railroad should make no significant additional investment in sleeping quarters *near hazardous railroad switching or humping operations* after July 1976.") (emphasis added).

underground piping system beneath the Moberly facility, the FRA was giving Norfolk a reasonable amount of time to correct the problem before it would conduct a follow-up inspection. Furthermore, the FRA stated, Norfolk's plans to renovate the Moberly site did not violate § 21106(2) because "[t]he estimated cost for remodeling the facility is approximately $200,000, . . . about 25 percent of the cost to construct a new facility," which did not meet the FRA's own regulatory definition of "reconstruction" as set forth in 49 C.F.R. § 228.101.[5] Finally, the FRA explained, two separate tests conducted by the FRA showed that noise levels in the sleeping quarters were below the maximum level permitted under 40 C.F.R. § 201.1 (railroad noise emissions standards) and therefore did not violate § 21106(1). Thereafter, the union timely filed the instant petition for review.

## Discussion

The FRA's decision to permit Norfolk's planned renovations of the sleeping quarters at the Moberly site was based upon a determination that the renovations did not constitute "reconstruction" under 49 U.S.C. § 21106(2), as that term is defined by regulation in 49 C.F.R.§ 228.101. The union argues, however, that the FRA lacked authority to promulgate that regulation because Congress intended to delegate to the FRA only *limited* authority to interpret terms within § 21106(2). More specifically, the

---

[5]Pursuant to the HSA amendments, the FRA has promulgated a rule defining the term "reconstruction" to include:

[r]ehabilitation or improvement of an existing facility (normal periodic maintenance excepted) involving the expenditure of an amount representing more than 50 percent of the cost of replacing such facility on the same site at the time the work of rehabilitation or improvement began, the replacement cost to be estimated on the basis of contemporary construction methods and materials.

49 C.F.R. § 228.101.

union contends that the FRA had statutory authority to interpret only the term "immediate vicinity" because the statute provides: "A railroad carrier and its officers and agents . . . may not begin, after July 7, 1976, construction or reconstruction of sleeping quarters referred to in clause (1) of this section in an area *or in the immediate vicinity of an area, as determined under regulations prescribed by the Secretary of Transportation*, in which railroad switching or humping operations are performed." 49 U.S.C. § 21106(2) (emphasis added). In support of this narrow interpretation of the statutory language, the union compares the fact that "[o]n various occasions the FRA has sought authority to issue regulations covering *hours of service*, and Congress has refused to grant such power." Brief for Petitioner at 16 (emphasis added). The union further argues that the FRA exceeded its authority in promulgating 49 C.F.R. § 228.101 because its definition of "reconstruction" contradicts the plain and ordinary meaning of the word and therefore is arbitrary, capricious, and contrary to the law. In support of this argument, the union cites several dictionary definitions of "reconstruct," which generally include terms such as "repair" and "rehabilitate." The union also suggests that the FRA's regulatory definition of "reconstruction" too readily permits, if not encourages, circumvention of the statute's intent. For this point, the union quotes from the concurring opinion in United Transp. Union v. Dole, 797 F.2d 823, 832 (10th Cir. 1986) (Logan, J., concurring), stating that Congress, in enacting § 21106(2), was frustrated with the FRA's "earlier inaction on safety matters" and, consequently, intended "that a railroad should make no significant additional investment in sleeping quarters near hazardous railroad switching or humping operations after July 1976."

While we agree with the union that the renovations of the sleeping quarters at the Moberly site probably violate the *spirit* of § 21106(2), through which Congress indicated its desire to phase out facilities that are located in or near switching yards, we hold that the union is bound, under the circumstances of this case, by the agency's actions. In Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984) (Chevron), the Supreme Court explained that, unless Congress has expressly spoken to the precise question at issue and its intent is clear and

unambiguous, the courts must defer to the administering agency's interpretation of the statute as set forth in the agency's regulations. Where the statute is silent or ambiguous, such legislative regulations interpreting the statute "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. . . . [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 844 (footnotes omitted).

The term "reconstruction," as used in § 21106(2), is imprecise and unclear. Therefore, under Chevron, the question of its precise meaning is just the kind of question for which we should defer to the administering agency for a regulatory answer. Moreover, we do not agree with the union's reading of the statute, construing § 21106(2)'s express reference to the Secretary of Transportation's rulemaking authority as a *limitation* on that authority. Nor are we persuaded by the union's analogy of the unrelated hours of service issue to the present "reconstruction" issue. We therefore defer to the administrator of the FRA, as the delegate of the Secretary of Transportation, in providing the pertinent regulatory interpretation. We conclude that the FRA's regulatory definition of "reconstruction" is not arbitrary, capricious, or contrary to law when considered in light of the HSA as a whole. The HSA has a goal of promoting "clean, safe, and sanitary" living conditions for railroad workers. 49 U.S.C. § 21106(1). The HSA also contemplates some degree of renovation or improvement of grandfathered facilities; otherwise, the statute would read: "A railroad carrier and its officers and agents . . . may not begin, after July 7, 1976, construction, reconstruction, *or renovation* of sleeping quarters" or something to that effect. Accordingly, we conclude that the FRA acted within its authority in promulgating 49 C.F.R. § 228.101, and we defer to the FRA's construction and application of that regulation in the present case. See Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566 (1980) ("The [Supreme] Court has often repeated the general proposition that considerable respect is due the interpretation given [a] statute by the officers or agency charged with its administration.") (internal quotation marks omitted) (citing cases).

-7-

On the separate issue of whether the sleeping quarters are so noisy, unsafe, and insanitary as to violate § 21106(1), the union maintains that, in light of the conclusions reached by the FRA upon inspecting the premises and its failure to take any action against Norfolk, the FRA has "close[d] its eyes to the obvious." Brief for Petitioner at 18. Therefore, the union urges this court to overturn the agency's "arbitrary action" and order the FRA to "find that the facility is not clean, safe, and sanitary, and not free from noise under the control of [Norfolk]." Id. at 18-19. The union, in other words, asks this court to order the FRA to find Norfolk in violation of § 21106(1) based entirely upon evidence of living conditions that no longer exist. However, the union has not identified any statutory remedy for past violations of § 21106(1). We therefore consider Norfolk's past violations, although apparently quite egregious, to be moot.[6] In sum, we hold that the union has failed to present this court with a justiciable claim under § 21106(1).

---

[6]We note, however, that the FRA has made the following representations to this court:

> Of course, FRA will not permit [Norfolk] to provide the Moberly facility as sleeping quarters for covered employees if it is not in compliance with the [HSA]. If [Norfolk] completes the renovation and the facility is still not in compliance, then FRA will take whatever action is necessary to ensure compliance. The agency will protect the health and safety of the railroad workers to the full extent of the law.

Brief for Respondent at 35.

## Conclusion

For the reasons stated, the relief sought by the union in its petition for review is denied.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.